IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MARTHA GOMEZ<br>　*Plaintiff*, | §<br>§<br>§ |
| v. | §    C.A. NO. 4:25-cv-1702<br>§<br>§ |
| HOUSTON HOUSING AUTHORITY<br>CORPORATION<br>　*Defendant*. | §<br>§<br>§<br>§ |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Martha Gomez ("Plaintiff" or "Gomez") bringing the causes of action listed herein against Defendant Houston Housing Authority Corporation ("Defendant" or "HHA") would respectfully show the court the following:

**I.   NATURE OF THE CASE**

1. This employment discrimination case is brought by Martha Gomez, a former employee of HHA. Specifically, Plaintiff (female) brings claims of gender discrimination due to a hostile work environment, disparate treatment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 ("Title VII") and the Texas Commission on Human Rights Act ("TCHUMAN RESOURCESA").

2. Plaintiff also brings this action under the Family and Medical Leave Act ("FMLA"), which entitles eligible employees of covered employers to take unpaid, job-

protected leave for specified family and medical reasons and prohibits employers from retaliating against employees for exercising their FMLA rights. *See* 29 U.S.C. §§ 2611-2615. Plaintiff's claims arise under the FMLA for retaliation resulting in termination following the exercise of FMLA leave rights.

3. Last, Plaintiff brings claims of disability discrimination and retaliation under the Americans with Disabilities Act of 1990 ("ADA").

## II.   PARTIES & SERVICE

4. Plaintiff Martha Gomez is an individual residing in Texas.

5. Defendant Houston Housing Authority Corporation is a public body corporate and political subdivision of the State of Texas organized under the Texas Local Government Code. Defendant may be served with process by serving a copy of the summons and complaint to its Chief Executive Officer or another authorized representative at its principal office located at 2640 Fountain View Drive, Houston, Texas 77057, or its registered agent, Kelvin Kim Williams, located at 4314 Yale St., Houston, Texas 77018.

6. Whenever in this Complaint it is alleged that HHA did or failed to do any act or thing, it is meant that HHA personally engaged in such conduct, or that HHA's governing body, directors, vice principals, officers, managers, agents, servants, employees and/or representatives did or failed to do such act or thing and that at the time such conduct occurred, it occurred with the authorization and/or ratification of HHA and/or was done in the normal and routine course and scope of employment or agency of HHA's governing body, directors, vice principals, officers, managers, agents, servants, employees and/or representatives.

### III.   JURISDICTION, VENUE, & IMMUNITY CONSIDERATIONS

7. The Court has subject matter jurisdiction over this case because it arises under the laws of the United States and is brought to recover damages for deprivation of equal rights. 28 U.S.C. § 1331.

8. The court has supplemental jurisdiction over Plaintiff's Texas State law claims because the claims are so related to claims with original federal jurisdiction that they form part of the same case controversy. 28 U.S.C. § 1367.

9. Within 300 days of the last discriminatory act complained of by Plaintiff filed her initial complaint with the Equal Employment Opportunity Commission ("EEOC") via Charge of Discrimination No. 453-2024-01690.

10. Therefore, Plaintiff has exhausted any applicable administrative remedies and on or about February 10, 2025, received the Dismissal and Notice of Right to Sue letter from EEOC. This lawsuit has been filed within 90 days of her receipt of the Dismissal and Notice of Right to Sue letter.

11. Although governmental entities in Texas are generally protected by governmental immunity, this doctrine does not bar suits for violations of federal civil rights statutes. Specifically, under Title VII and 42 U.S.C. § 1983, governmental entities such as HHA are not immune from suit in federal court for violations of federal law. *See Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976); *see also Monell v. Department of Social Services*, 436 U.S. 658 (1978).

12. To the extent Plaintiff asserts claims under Texas state law, HHA governmental immunity is waived under Texas Labor Code which explicitly states that

political subdivisions, including housing authorities, are considered "employer[s]." TEX. LAB. CODE. §§ 21.002(8)(D) AND 21.055.

13. Thus, all conditions precedent to filing this lawsuit and as required by law have been performed or have occurred.

14. Venue is proper in this judicial district court 28 U.S.C. §1391(b), (c) and 42 U.S.C. §2000e- 5(f)(3), because HHA conducts business in the district, and a substantial part of the events or omissions giving rise to Plaintiff's causes of action arises from conduct within the Southern District of Texas, Houston Division.

### IV.   FACTS

15. In approximately February of 2019, Gomez began working for HHA as a Senior Community Development Coordinator.

16. On about May 31, 2019, Plaintiff's employment agreement was modified to allow remote work, which Plaintiff successfully performed for a significant period.

17. Plaintiff was offered the remote position by Director of REID Cody Roskelley, Senior Vice President, Mark Thiele, and the CEO at the time, Tory Gunsolley. Plaintiff had an existing phobia of being on camera due to a previous stalking incident, but she did not feel the need to disclose this to HHA at that time because her former supervisor, Cody Roskelley, and supervisors after him, did not require her to have her camera on and notably, HHA's employee manual did not require her to turn on her camera during remote meetings.

18. In about the first quarter of 2022, when David Northern ("Northern") became the CEO of HHA, Plaintiff's workplace environment began to deteriorate and became increasingly hostile.

19. Specifically, on about March 24, 2022, Plaintiff disclosed to her supervisor, Jay Mason ("Mason")., that she disclosed her phobia of being on camera during online meetings and possible pictures of her taken. This sensitive disclosure of information was ignored.

20. On about December 9, 2022, during Plaintiff's first formal evaluation by Mason, Mason made comments to Plaintiff in a demeaning manner about or relating to her gender (female). After these comments, Plaintiff sent an email addressing these comments to Mason and carbon copied Northen but received no response from Mason or Northern. In other words, Plaintiff engaged in a protected activity by addressing gender-based charged comments towards her by Mason by emailing Mason and Northern.

21. In about April of 2023, Plaintiff had a medical emergency and was put under the long-term care of several doctors, including a cardiologist.

22. On about June 5, 2023, Mason delegated the responsibilities of each team member and Plaintiff was assigned a substantially larger amount of work than that given to her male colleagues. Plaintiff inquired about what assignments she should prioritize, but her inquiry was ignored which left Plaintiff unclear about what assignments to work on.

23. On about October 5, 2023, another one of Plaintiff's supervisors, Cupid Alexander, emailed one of Plaintiff's coworkers about speaking to Mason regarding the

demeaning, gender-based comments Mason makes to staff members. This coworker shared the email with Plaintiff.

24. On about January 3, 2024, Plaintiff had another performance evaluation conducted by Mason and a Human Resources (HUMAN RESOURCES) Representative, Sheraya Herring ("Herring"), was present. Plaintiff brought up how her job duties were unclear, and Mason responded by blaming Plaintiff for not performing duties that were the express responsibility of Plaintiff's male colleagues, the very duties that Mason had previously delegated to those colleagues and not Plaintiff.

25. After the surprising negative performance review, Plaintiff emailed Herring to request a meeting about the hostile work environment based on gender and, to some extent, her medical emergency, that she had been experiencing at the hands of Mason at HHA. In the email, Plaintiff briefly stated the reasons for her complaints and Mason was cc'd in the email.

26. The meeting occurred on about January 10, 2024, and Plaintiff outlined the instances of gender discrimination she experienced at the hands of Mason. HUMAN RESOURCES told Plaintiff that they would conduct an investigation, but Plaintiff never received any communications about her complaints after that. It is unclear whether there was an investigation at all.

27. On about January 18, 2024, shortly after Plaintiff made a formal complaint to HUMAN RESOURCES about Mason, Mason suddenly instituted a mandatory camera-on policy for Plaintiff's department during virtual meetings, despite Plaintiff's prior disclosure to him about her phobia related to being on camera. Put simply, this was

retaliation for Plaintiff's complaint about his discriminatory behavior. In a subsequent meeting when most, if not all, of Plaintiff's male colleague's had their camera's off, Mason reprimanded her *and* her female colleagues for having her camera off but did not reprimand Plaintiff's male colleagues who had their cameras off.

28. Mason also went so far in his discrimination and retaliation as to direct an IT personnel at HHA to ensure that Plaintiff's camera stay on her work computer, which he never did for any of Plaintiff's male coworkers.

29. On about February 11, 2024, Plaintiff emailed Human Resources to report the retaliatory incidents by Mason that stemmed from her complaints against him and provided documentation that showed the necessity of her not being on camera, among other things. Human Resources confirmed receipt of Plaintiff's medical restrictions. Also, Plaintiff carbon copied Northern in this email in an attempt to keep the proper persons in the loop on this issue but Northern contacted Plaintiff afterwards and told her not to carbon copy him on any emails moving forward.

30. Also, Plaintiff visited a cardiologist after these instances of retaliation, and was told her blood pressure was extremely high. When Plaintiff notified the cardiologist about her anxiety connected to and regarding the new camera policy at HHA, the cardiologist placed Plaintiff on a no-camera restriction, as this policy had directly affected her health.

31. On about February 12, 2024, Plaintiff notified Human Resources about these amended restrictions, and they confirmed receipt of Plaintiff's restrictions.

32. On about February 15, 2024, Plaintiff received a notice stating that all employees working remotely due to COVID-19 were required to return to the office, even though Plaintiff's remote work arrangement had been established before and separate from the pandemic.

33. Plaintiff requested an extension to the date that she was supposed to return to the office so that she could request a special accommodation for her diabetes diagnosis.

34. On about April 9, 2024, Plaintiff submitted her paperwork for the special accommodations, including her medical records and Human Resources confirmed receipt of all this information.

35. On about April 17, 2024, HHA denied Plaintiff's work accommodations and stated she was requesting accommodation for allergies rather than her disability, so Plaintiff sent an email clarifying this. Although Plaintiff clarified, the accommodations were denied due to alleged "undue hardship to the agency." When Plaintiff asked how an accommodation would be of undue hardship to HHA, she received no response.

36. The same day Plaintiff sent the email, Mason instructed Plaintiff to train a new individual who was hired as a Senior Community Development Coordinator, the same position as Plaintiff. Because of that, Plaintiff anticipated that HHA was going to fire her and that the individual she was instructed to train would be her replacement.

37. On about April 23, 2024, the anxiety of going back to work in person was so bad that Plaintiff had to call out and seek medical attention. Plaintiff's medical provider recommended that she go on medical leave. Plaintiff reported this to HHA.

38. On about April 25, 2024, Plaintiff began the process of requesting Family and Medical Leave Act (FMLA) leave. Plaintiff requested FMLA leave through FMLA Source, the company HHA used to handle FMLA requests.

39. However, despite her qualifying for FMLA, on about April 30, 2024, FMLA Source notified Plaintiff that her FMLA leave was denied. When she inquired about the reason why, they informed her that she did not work enough hours and told her that HHA reported that Plaintiff worked only 652, which was not accurate.

40. Also, while on FMLA leave, in May 2024, Plaintiff was diagnosed with Post-Traumatic Stress Disorder (PTSD) which was triggered by and a direct result of the newly-imposed requirement by Mason at HHA for Plaintiff to have her camera on.

41. On about May 16, 2024, the Human Resources director, Rizan Quadri, sent an email to staff regarding how remote employees were required to clock in. This email contradicted what HHA previously told Plaintiff regarding how there would be no remote employees moving forward and that they were not able to accommodate her with remote work. In other words, HHA's reasons for refusing to allow Plaintiff to work from home, even with a doctor's note, was pretextual.

42. On about July 7, 2024, there was a hurricane, so HHA closed the facility for three days. HHA emailed employees that they would not have to use their paid time off (PTO) hours, but Plaintiff's PTO hours were reduced. Due to the foregoing issues, it is likely that Plaintiff's hours were the only HHA's employees' hours that were reduced. Plaintiff was being singled out.

43. Plaintiff prepared to file another request for FMLA leave since the previous one was denied despite Plaintiff being qualified, but she received a letter from HHA stating that she exhausted her potential leave requests and was required to return to work. When Plaintiff sent an email to HHA to address this issue, she received an immediate response that stated she was no longer an employee with HHA.

44. Ultimately, on about July 25, 2024, Plaintiff received a letter via mail from HHA that stated she was formally terminated from her employment.

45. Plaintiff was never notified that she was put on a Performance Improvement Plan at any point during her employment with HHA.

## V.     FMLA VIOLATION

### I.     COUNT 1 – RETALIATION VIOLATION UNDER 29 U.S.C. § 2615(B)

46. Plaintiff repeats and re-alleges all facts alleged above with the same force and effect as though fully set forth herein. FED. R. CIV. P. 10(c).

47. Defendant is a covered employer under the FMLA, as it employs 50 or more employees within a 75-mile radius of Plaintiff's worksite while she was working for HHA. Thus, Defendant is subject to the requirements and prohibitions of the FMLA, including those pertaining to FMLA leave entitlement and anti-retaliation provisions.

48. Plaintiff, an eligible employee under FMLA, exercised her rights by taking FMLA leave to care for her diagnoses of diabetes, PTSD, and hypertension.

49. Defendant interfered with Plaintiff's rights under the FMLA by denying her valid request for medical leave, misreporting her hours worked to disqualify her from eligibility, and failing to provide notice or an accurate accounting of Plaintiff's FMLA

leave status.

50. Following Plaintiff's application for FMLA leave, Plaintiff was told she had exhausted leave without any proof and was abruptly terminated from her position with HHA.

51. These actions were taken in retaliation for Plaintiff's exercise of her FMLA rights.

52. As a result of Defendant's unlawful retaliation under FMLA, Plaintiff has suffered damages, including lost wages, emotional distress, and other economic and non-economic losses.

53. Thus, Defendant violated 29 U.S.C. § 2615(b) of the FMLA by retaliating against Plaintiff for exercising her FMLA rights.

## VI. DISCRIMINATION UNDER FEDERAL AND STATE LAW

### I. COUNTS 2 - 3: GENDER DISCRIMINATION CLAIMS UNDER TITLE VII ((2) HOSTILE WORK ENVIRONMENT & (3) DISPARATE TREATMENT)

54. Plaintiff repeats and re-alleges all facts alleged above with the same force and effect as though fully set forth herein.

55. As a female, Plaintiff is a member of a protected class under Title VII of the Civil Rights Act.

56. During her employment with HHA, Plaintiff was subjected to discrimination based on her gender by Defendant when they treated her differently (and badly) based on her gender (disparate treatment) in terms of job assignments and workplace treatment. Males at HHA were not treated as badly as Plaintiff and other female employees of HHA.

57. Specifically, as stated in the foregoing factual allegations, Plaintiff was subjected to derogatory sexist remarks, assigned a larger workload than her male coworkers, reprimanded for conduct that male employees were not disciplined for, blamed for duties that were assigned to male colleagues, and excluded from meeting and decision-making processes that included male employees due to her gender.

58. HHA and their agents not only ignored the hostility and discrimination against Plaintiff, but ratified Mason's conduct after Plaintiff complained about him and nothing was done.

## II. COUNT 4: DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT OF 1990

59. Plaintiff repeats and re-alleges all facts alleged above with the same force and effect as though fully set forth herein.

60. Plaintiff is an individual with a qualified disability under the Americans with Disabilities Act of 1990. Specifically, Plaintiff suffers from PTSD, high blood pressure, diabetes, and anxiety related to a camera phobia stemming from a prior stalking incident. These conditions substantially limit one or more major life activities.

61. Plaintiff disclosed her disabilities to her supervisors and HUMAN RESOURCES and requested reasonable accommodations, including not being required to turn on her camera during virtual meetings and to continue working remotely due to her medical restrictions.

62. Defendant refused to reasonably accommodate Plaintiff's disabilities, denied her medical accommodation requests, and instead instituted policies that exacerbated her

medical conditions, including the mandatory camera-on policy and the requirement to return to in-person work despite prior approval of remote work arrangements.

### III.    COUNT 5: DISCRIMINATION UNDER TEXAS LAW

63.    Plaintiff adopts by reference all of the facts set forth above. *See*, TEX. R. CIV. P. 58.

64.    Plaintiff is a member of one or more protected classes under Chapter 21, Sec. 21.051 of the Texas Labor Code ("TCHUMAN RESOURCESA"). An employer commits unlawful practices under the statute if, because of an employee being a part of a protected class, they (1) discharge an employee or discriminate against an employee in any manner in connection with pay or any terms, conditions or privileges of the individual's employment; or (2) limit, segregates, or classify an employee or applicant for employment in a manner that deprives the employee of any employment opportunities or adversely affect the status of the employee in any way. *See*, Chapter 21, Sec. 21.051 of the Texas Labor Code. Here, Plaintiff was discriminated against and ultimately terminated due to her gender and disabilities.

65.    Specifically, Plaintiff, a female, was subjected to differential treatment compared to her male colleagues and colleagues without disabilities. Despite reporting instances of discrimination and a hostile work environment, Plaintiff's complaints were ignored, and no corrective actions were taken against any of HHA's agents.

66. Instead of addressing the misconduct by Mason, Plaintiff was reprimanded for false accusations made by Mason and subject to faulty performance reviews by Mason, who contributed to the hostile work environment.

67. Therefore, HHA's conduct is in violation of multiple sections of Chapter 21 of the Texas Labor Code. *See* TEX. LAB. CODE §§ 21.051(1), 21.105.

## IV. COUNTS 6 - 8-: RETALIATION UNDER FEDERAL AND STATE LAW

### A. (6) RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT

68. Plaintiff engaged in protected activity by reporting gender discrimination to HHA, including complaining to her superiors and HUMAN RESOURCES about demining, gender-based comment made by her supervisor, Mason, raising concerns about the disproportionate workload compared to her male colleagues, and reporting that she was blamed for duties that were

69. Following Plaintiff's complaints, Defendant retaliated against Plaintiff by assigning her an excessive workload without guidance or support and ultimately, terminated Plaintiff's employment shortly after these complaints.

70. Defendant's retaliatory conduct escalated over time, culminating in actions that made it impossible for Plaintiff to continue working at HHA.

### B. (7) RETALIATION UNDER THE ADA

71. Plaintiff engaged in protected activity by disclosing her disabilities, including anxiety, diabetes, and hypertension to HHA, providing medical documentation to support her need for accommodations, and requesting reasonable accommodations including camera exemptions and remote work continuation.

72. Shortly after Plaintiff made these disclosures and requests HHA, suddenly instituted a mandatory camera-on policy despite knowledge of her condition, sent IT to verify Plaintiff's camera function in a targeted and harassing manner, refused to approve her documented accommodation requests, and assigned excessive and unclear workloads.

73. Ultimately, HHA terminated Plaintiff's employment shortly after denying accommodations and medical leave.

C. (8) RETALIATION UNDER TEXAS LAW

74. Plaintiff engaged in protected activity under the Texas Labor Code by reporting discriminatory treatment based on gender and her disabilities to HHA leadership, including Human Resources and upper management. Texas Labor Code § 21.055.

75. Rather than addressing these concerns, Defendant took adverse actions against Plaintiff that were connected to her protected activity.

76. The timing and circumstances of her constructive discharge provide a clear causal connection to her protected activities, constituting retaliation under the Texas Labor Code § 21.055.

77. Since retaliation claims under Texas law are the same or similar, Plaintiff relies on the foregoing factual allegation with regard to her retaliation claim under Title VII.

## VII.   DAMAGES

78. Due to the discrimination based on gender, disability, and the FMLA violations suffered at the hands of Defendant, Plaintiff has suffered actual damages including but limited to, lost wages (front and back pay), denied opportunities lost raises

and bonuses, a demotion, loss of seniority and retirement benefits, loss of medical benefits, severe emotional distress, mental anguish and suffering.

79. In addition, Plaintiff avers that Defendant's unlawful discrimination justifies an award of compensatory and/or punitive damages.

80. Further, Plaintiff is authorized to recover liquidated damages on her claims by statute. 29 U.S.C. § 2617(a)(1)(A)(iii).

81. Moreover, Plaintiff seeks to recover attorney's fees under the appropriate fee-shifting statute if she is the prevailing party to this action.

82. These irreparable injuries and monetary damages are the results of Defendant's discriminatory and retaliatory practices and assault, and they will continue unless and until this Court grants relief.

## VIII.  PRAYER

For these reasons, Plaintiff prays that Defendant be cited to appear and answer herein and that this case be advanced for trial, and that on final hearing this Court grant the following relief:

a) For actual economic damages including, but not limited to, front and back pay to compensate Plaintiff for loss of income and/or employment-related benefits resulting from the discriminatory and retaliatory actions of Defendant;

b) Compensatory damages for severe mental anguish and emotional distress relating to the discrimination and retaliation she faced with Defendant in the past and future, injury to her reputation, adverse effects on her career, and

diminished earning capacity resulting from the discriminatory and retaliatory actions of Defendant;

c) For exemplary and/or punitive damages in the amount found by the trier of fact to punish and deter continuation of Defendant's unlawful employment practices;

d) An award of reasonable attorney's fees and the cost and expenses related to the litigation of this claim under the appropriate fee-shifting statute;

e) Pre-judgment interest at the highest rate allowed by law;

f) Post-judgment interest at the highest rate allowed by law; and

g) For such other and further relief to which this Court deems Plaintiff is justly entitled and/or deems proper.

Respectfully Submitted,

**SPACE CITY LAW FIRM**

*BDavidson*
_____
Bridget Davidson
*bdavidson@spacecitylaw.com*
TBN: 24096858
SPACE CITY LAW FIRM
440 Louisiana Street, Suite 1110
Houston, Texas 77002
Tel.: 713-568-5305
Fax: 713-583-1107

**ATTORNEY FOR PLAINTIFF**